IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEN KINNEY, on behalf of Plaintiff and the class members described below, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| AMAZON.COM, INC.; and AMAZON.COM SERVICES LLC; | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff, Ben Kinney, respectfully requests that the Court order that this action, alleging breach of contract (Count I), deceptive practices under Illinois law (Count II), and deceptive practices under Washington law (Count III), may proceed on behalf of a three classes against Defendants Amazon.com, Inc. and Amazon.com Services LLC.

The breach of contract class consists of consists of (a) all individuals (b) who purchased goods on Amazon Prime (c) with a price of $500 or more (d) at a price which Amazon represented to involve savings compared to a comparison price (e) not maintained by Amazon at least 50% of the past six months and (f) the purchase was made within five years prior to the filing of this action.

The deceptive practices under Illinois law class consists of (a) all individuals with Illinois addresses (b) who purchased goods on Amazon Prime (c) with a price of $500 or more (d) at a price which Amazon represented to involve savings compared to a comparison price (e) not maintained by Amazon at least 50% of the past six months and (f) the purchase was made within three years prior to the filing of this action.

The deceptive practices under Washington law class consists of (a) all individuals (b) who purchased goods on Amazon Prime (c) with a price of $500 or more (d) at a price which Amazon

represented to involve savings compared to a comparison price (e) not maintained by Amazon at least 50% of the past six months and (f) the purchase was made within four years prior to the filing of this action.

Plaintiff is required to file a motion for class certification with the Complaint, *Ballard RN Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.,* 2015 IL 118644, 48 N.E.3d 1060, and may request leave to supplement it later.

In support of this motion, Plaintiff states:

## **NATURE OF THE CASE**

1. Plaintiff Ben Kinney is a resident of Chicago, Illinois.

2. Defendant Amazon.com, Inc., is a Delaware corporation with its principal office at 410 Terry Avenue N., Seattle, WA 98109-5210. Its registered agent and office is Corporation Service Company, 300 Deschutes Way SW, Ste. 208 MC-CSC1, Tumwater, WA 98501.

3. Defendant Amazon.com, Inc., operates the Amazon.com website.

4. Defendant Amazon.com Services LLC is a limited liability company organized under the law of Delaware with its principal offices at 410 Terry Avenue N., Seattle, WA 98109-5210. It does business in Illinois. Its registered agent and office is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703. On information and belief, its sole manager is a resident of Washington state. On information and belief, it is responsible for the customer Fulfillment and customer service operations of Amazon.com.
Plaintiff subscribed to the Amazon Prime service, paying a monthly fee for that purpose.

5. Amazon Prime is a paid subscription service from Amazon which gives users access to additional services otherwise unavailable or available at a premium to other Amazon customers.

6. One of the services provided is special price reductions, "Prime Exclusive Savings for You." This is part of the services that Amazon Prime customers pay for.

7. Plaintiff relied on the fact that Amazon Prime offered genuine price reductions in

subscribing to and paying for Amazon Prime.

8. In October 2022, Plaintiff purchased an LG television advertised by Amazon.

9. Amazon advertised the television as $1,496.99, marked down from $2,499.99. A copy of the advertisement is attached as Exhibit A. The advertisement is marked "40% off."

10. When Plaintiff purchased the television, the list price displayed changed to $2,199, the 40% off disappeared, and the deal was "$700 off." The total before tax remained $1,496.99. (Exhibit B)

11. Plaintiff relied on Exhibits A and B in purchasing the television.

12. Plaintiff believed that he was being offered a genuine price reduction.

13. In fact, as shown on Exhibit C, Amazon generally sold the television at about $1500, increased the price to over $2,000 for about a month, and then advertised it to Prime customers as 40% off.

14. Plaintiff was unaware of this when he purchased the television.

15. Amazon describes a "strike-through price," such as that in Exhibit A, as follows:

Strike-Through Pricing and Savings

Items on Amazon may display a List Price, Was Price, or other strike-through pricing or saving information on the product detail page.

The List Price is the suggested retail price of a new product as provided by a manufacturer, supplier, or seller. Except for books, Amazon will only display a List Price if the product was purchased by customers on Amazon or offered by other retailers at or above the List Price in the past 90 days for non-seasonal products (like TVs and Headphones) and in the past 180 days for seasonal products (like ski jackets and shoes). List prices may not necessarily reflect the prevailing market price of a product. . . .

16. There is no requirement for any minimum number of sales.

17. The Federal Trade Commission states as follows (16 C.F.R. part 233) with respect to comparative price advertising:

§ 233.1 Former price comparisons.

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price

comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

(c) The following is an example of a price comparison based on a fictitious former price. John Doe is a retailer of Brand X fountain pens, which cost him $5 each. His usual markup is 50 percent over cost; that is, his regular retail price is $7.50. In order subsequently to offer an unusual "bargain", Doe begins offering Brand X at $10 per pen. He realizes that he will be able to sell no, or very few, pens at this inflated price. But he doesn't care, for he maintains that price for only a few days. Then he "cuts" the price to its usual level - $7.50 - and advertises: "Terrific Bargain: X Pens, Were $10, Now Only $7.50!" This is obviously a false claim. The advertised "bargain" is not genuine.

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

(e) If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered. [Guide I]

§ 233.2 Retail price comparisons; comparable value comparisons.

(a) Another commonly used form of bargain advertising is to offer goods at prices lower than those being charged by others for the same merchandise in the advertiser's trade area (the area in which he does business). This may be done either on a temporary or a permanent basis, but in either case the advertised higher price must be based upon fact, and not be fictitious or misleading. Whenever an advertiser represents that he is selling below the prices being charged in his area for a particular article, he should be reasonably certain that

-4-

the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made in the area - that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving. Expressed another way, if a number of the principal retail outlets in the area are regularly selling Brand X fountain pens at $10, it is not dishonest for retailer Doe to advertise: "Brand X Pens, Price Elsewhere $10, Our Price $7.50".

(b) The following example, however, illustrates a misleading use of this advertising technique. Retailer Doe advertises Brand X pens as having a "Retail Value $15.00, My Price $7.50," when the fact is that only a few small suburban outlets in the area charge $15. All of the larger outlets located in and around the main shopping areas charge $7.50, or slightly more or less. The advertisement here would be deceptive, since the price charged by the small suburban outlets would have no real significance to Doe's customers, to whom the advertisement of "Retail Value $15.00" would suggest a prevailing, and not merely an isolated and unrepresentative, price in the area in which they shop.

(c) A closely related form of bargain advertising is to offer a reduction from the prices being charged either by the advertiser or by others in the advertiser's trade area for other merchandise of like grade and quality - in other words, comparable or competing merchandise - to that being advertised. Such advertising can serve a useful and legitimate purpose when it is made clear to the consumer that a comparison is being made with other merchandise and the other merchandise is, in fact, of essentially similar quality and obtainable in the area. The advertiser should, however, be reasonably certain, just as in the case of comparisons involving the same merchandise, that the price advertised as being the price of comparable merchandise does not exceed the price at which such merchandise is being offered by representative retail outlets in the area. For example, retailer Doe advertises Brand X pen as having "Comparable Value $15.00". Unless a reasonable number of the principal outlets in the area are offering Brand Y, an essentially similar pen, for that price, this advertisement would be deceptive. [Guide II]

§ 233.3 Advertising retail prices which have been established or suggested by manufacturers (or other nonretail distributors).

(a) Many members of the purchasing public believe that a manufacturer's list price, or suggested retail price, is the price at which an article is generally sold. Therefore, if a reduction from this price is advertised, many people will believe that they are being offered a genuine bargain. To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.

(b) There are many methods by which manufacturers' suggested retail or list prices are advertised: Large scale (often nationwide) mass-media advertising by the manufacturer himself; preticketing by the manufacturer; direct mail advertising; distribution of promotional material or price lists designed for display to the public. The mechanics used are not of the essence. This part is concerned with any means employed for placing such prices before the consuming public.

(c) There would be little problem of deception in this area if all products were invariably sold at the retail price set by the manufacturer. However, the widespread failure to observe manufacturers' suggested or list prices, and the advent of retail discounting on a wide scale, have seriously undermined the dependability of list prices as indicators of the exact prices at which articles are in fact generally sold at retail. Changing competitive conditions have

-5-

created a more acute problem of deception than may have existed previously. Today, only in the rare case are all sales of an article at the manufacturer's suggested retail or list price.

(d) But this does not mean that all list prices are fictitious and all offers of reductions from list, therefore, deceptive. Typically, a list price is a price at which articles are sold, if not everywhere, then at least in the principal retail outlets which do not conduct their business on a discount basis. It will not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made in the advertiser's trade area (the area in which he does business). Conversely, if the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price.

(e) This general principle applies whether the advertiser is a national or regional manufacturer (or other non-retail distributor), a mail-order or catalog distributor who deals directly with the consuming public, or a local retailer. But certain differences in the responsibility of these various types of businessmen should be noted. A retailer competing in a local area has at least a general knowledge of the prices being charged in his area. Therefore, before advertising a manufacturer's list price as a basis for comparison with his own lower price, the retailer should ascertain whether the list price is in fact the price regularly charged by principal outlets in his area.

(f) In other words, a retailer who advertises a manufacturer's or distributor's suggested retail price should be careful to avoid creating a false impression that he is offering a reduction from the price at which the product is generally sold in his trade area. If a number of the principal retail outlets in the area are regularly engaged in making sales at the manufacturer's suggested price, that price may be used in advertising by one who is selling at a lower price.

If, however, the list price is being followed only by, for example, small suburban stores, house-to-house canvassers, and credit houses, accounting for only an insubstantial volume of sales in the area, advertising of the list price would be deceptive.

(g) On the other hand, a manufacturer or other distributor who does business on a large regional or national scale cannot be required to police or investigate in detail the prevailing prices of his articles throughout so large a trade area. If he advertises or disseminates a list or preticketed price in good faith (i.e., as an honest estimate of the actual retail price) which does not appreciably exceed the highest price at which substantial sales are made in his trade area, he will not be chargeable with having engaged in a deceptive practice. Consider the following example:

(h) Manufacturer Roe, who makes Brand X pens and sells them throughout the United States, advertises his pen in a national magazine as having a "Suggested Retail Price $10," a price determined on the basis of a market survey. In a substantial number of representative communities, the principal retail outlets are selling the product at this price in the regular course of business and in substantial volume. Roe would not be considered to have advertised a fictitious "suggested retail price." If retailer Doe does business in one of these communities, he would not be guilty of a deceptive practice by advertising, "Brand X Pens, Manufacturer's Suggested Retail Price, $10, Our Price, $7.50."

(i) It bears repeating that the manufacturer, distributor or retailer must in every case act honestly and in good faith in advertising a list price, and not with the intention of establishing a basis, or creating an instrumentality, for a deceptive comparison in any local or other trade area. For instance, a manufacturer may not affix price tickets containing inflated

prices as an accommodation to particular retailers who intend to use such prices as the basis for advertising fictitious price reductions. [Guide III]

18. The number of sales at the "comparison" price must be more than nominal.

19. Defendants have previously been found to engage in fictitious price reductions. (Exhibits D and E)

20. The consequences of the fictitious price reductions include that Amazon Prime subscribers do not receive the benefits for which they pay.

21. Amazon breached its promise of "Prime Exclusive Savings for You" when it increased the price of goods and then decreased them, representing that it was providing "savings" to its customer.

22. Defendants engage in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by selling goods to Amazon Prime customers at fictitious sale prices.

23. 815 ILCS 505/2 provides:

> Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

24. Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, provides:

> Sec. 2. Deceptive trade practices.
>
> (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: . . .
>
>   (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
>   (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding. . . .

25. Defendants' terms of service incorporate Washington state law.

26.     Rev. Code Wash. §19.86.020 provides that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

27.     Rev. Code Wash. §19.86.090 provides that "Any person who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action in superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee. In addition, the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained: PROVIDED, That such increased damage award for violation of RCW 19.86.020 may not exceed twenty-five thousand dollars . . . ."

28.     Rev. Code Wash. § 19.86.093 provides that "In a private action in which an unfair or deceptive act or practice is alleged under RCW 19.86.020, a claimant may establish that the act or practice is injurious to the public interest because it: (1) Violates a statute that incorporates this chapter; (2) Violates a statute that contains a specific legislative declaration of public interest impact; or (3) (a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons."

29.     Rev. Code Wash. 19.86.120 provides that "Any action to enforce a claim for damages under RCW 19.86.090 shall be forever barred unless commenced within four years after the cause of action accrues . . . ."

## REQUIREMENTS FOR CLASS CERTIFICATION

30.     Section 2-801 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-801, states:

Prerequisites for the maintenance of a class action.

An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:

(1)     The class is so numerous that joinder of all members is impracticable.

(2)     There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy.

Although the statute was modeled after Rule 23 of the Federal Rule of Civil Procedure, some differences exist between the two. *Eshaghi v. Hanley Dawson Cadillac Co.,* 214 Ill. App. 3d 995, 999, 574 N.E.2d 760, 762 (1st Dist. 1991).

31. The class action determination is to be made as soon as practicable after the commencement of an action brought as a class action and before any consideration of the merits. 735 ILCS 5/2-802. The circuit court has discretion as to whether an action may proceed as a class action. *Haywood v. Superior Bank,* 244 Ill. App. 3d 326, 328, 614 N.E.2d 461, 463 (1st Dist. 1993) (overturning the lower court's denial of class certification in a landlord-tenant case).

32. Class actions are essential to enforce laws protecting consumers. As the court stated in *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill.App.3d 995, 574 N.E.2d 760 (1st Dist. 1991):

> In a large and impersonal society, class actions are often the last barricade of consumer protection. . . . To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups. The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting. The alternatives to the class action -- private suits or governmental actions -- have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective. The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer. (574 N.E.2d at 764, 766)

33. As demonstrated below, each of the requirements for class certification is met.

**Numerosity**

34. Section 2-801(1) parallels the language of Federal Rule of Civil Procedure 23(a)(1); therefore, federal case law is instructive on the numerosity requirements under the Illinois Rules. *Wood River Area Dev. Corp. v. Germania Fed. Sav. & Loan Ass'n*, 198 Ill. App. 3d 445, 450, 555 N.E.2d 1150, 1153 (5th Dist. 1990). The numerosity requirement is satisfied if it is reasonable to conclude that the number of members of the proposed class is greater than the minimum number required for class certification, which is about 10-40. *Kulins v. Malco*, 121 Ill. App. 3d 520, 530, 459 N.E.2d 1038 (1st Dist. 1984) (19 and 47 members sufficient); *Swanson v. American Consumer Industries*, 415 F.2d

1326, 1333 (7th Cir. 1969) (40 class members sufficient); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986) (10-29 members sufficient).

35. Illinois case law further indicates that "[t]he number of class members is relevant, not determinative." *Wood River Area Dev. Corp.,* 198 Ill. App. 3d at 450, 555 N.E. 2d at 1153. Where the class size is smaller, other factors may come into play to demonstrate that joinder is impractical, including: (1) geographical spread of class members, (2) ease of identifying and locating class members, (3) the knowledge and sophistication of class members and their need for protection, (4) the size of class members' claims, and (5) the nature of the case. *Id.* at 450-51, 555 N.E. 2d at 1153-54.

36. It is not necessary that the precise number of class members be known: "A class action may proceed upon estimates as to the size of the proposed class.*"* *In re Alcoholic Beverages Lit.,* 95 F.R.D. 321 (E.D.N.Y. 1982); *Lewis v. Gross,* 663 F.Supp. 1164, 1169 (E.D.N.Y. 1986). The Court may "make common sense assumptions in order to find support for numerosity." *Evans v. United States Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983). "The court may assume sufficient numerousness where reasonable to do so in absence of a contrary showing by defendant, since discovery is not essential to most cases in order to reach a class determination. . . . Where the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable." 2 *Newberg on Class Actions* (3d ed. 1995), §7.22.

37. In the present case, Plaintiff alleges that the each class is so numerous that joinder of all members is not practicable, based on the volume of Defendants' business activity. Specifically, Defendant Amazon.com, Inc. states that "[o]ver 42 million unique desktop users in the U.S. visit Amazon stores each month" and "[o]ver 126 million unique mobile visitors in the U.S. visit Amazon stores each month" (Exhibit F).

38. While discovery will be needed to determine the precise class size, it is reasonable to infer that numerosity is satisfied. *Wood River Area Dev. Corp.,* 198 Ill. App. 3d at 450, 555 N.E.2d at

1153 (concurring with a leading scholar's assertion that a class size of 40 clearly satisfies numerosity and that a class size of 25 likely satisfies numerosity); *Swiggett v. Watson,* 441 F.Supp. 254, 256 (D.Del. 1977) (an action challenging transfers of title pursuant to Delaware motor vehicle repairer's lien, the fact the Department of Motor Vehicles issued printed forms for such transfer was in of itself sufficient to show that the numerosity requirement was satisfied); *Westcott v. Califano*, 460 F. Supp. 737, 744 (D.Mass. 1978) (in action challenging certain welfare policies, existence of policies and 148 families who were denied benefits to which policies applied sufficient to show numerosity, even though it was impossible to identify which of 148 families were denied benefits because of policies complained of).

**Common Questions and Predominance**

39. A common question may be shown when the claims of the individual members of the class are based on the common application of a statute or they were aggrieved by the same or similar misconduct. *McCarthy v. La Salle Nat'l Bank & Trust Co.,* 230 Ill. App. 3d 628, 634, 595 N.E.2d 149, 153 (1st Dist.1992).

40. In the present case, the predominant common questions are:

    a. Whether Amazon engages in false price advertising;

    b. Whether this violates the contract with Amazon Prime customers.

41. Where a case involves "standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement . . . is usually met." *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984).

42. The only individual issue is the identification of the class members, a matter easily ascertainable from the files of Defendants.

43. Questions readily answerable from a party's files do not present an obstacle to class certification. *Heastie v. Community Bank*, 125 F.R.D. 669 (N.D.Ill. 1989) (court found that common issues predominated where individual questions of injury and damages could be determined by "merely comparing the contract between the consumer and the contractor with the contract between

the consumer and Community Bank").

**Adequacy of Representation**

44. The class action statute requires that the class representative provide fair and adequate protection for the interests of the class. That protection involves two factors: (a) the attorney for the class must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the representative must not have interests antagonistic to those of the class. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992).

45. Plaintiff understands the obligations of a class representative, and has retained experienced counsel, as is indicated by Exhibit G, which sets forth counsel's qualifications.

46. There are no conflicts between Plaintiff and the class members.

**Appropriateness of Class Action**

47. Efficiency is the primary focus in determining whether the class action is an appropriate method for resolving the controversy presented. *Eovaldi v. First Nat'l Bank,* 57 F.R.D. 545 (N.D.Ill. 1972). It is proper for a court, in deciding this issue, to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir. 1974).

48. In this case there is no better method available for the adjudication of the claims which might be brought by each individual consumer. The vast majority of consumers are undoubtedly unaware that their rights are being violated. In addition, the modest size of the claims makes it unlikely that consumers would be able to pay to retain counsel to protect their rights on an individual basis.

49. The special efficacy of the class action has been noted by the courts and is applicable to this case:

> A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied . . . .

*In re Folding Carton Antitrust Lit.*, 75 F.R.D. 727, 732 (N.D.Ill. 1977) (citations omitted).) Another court noted:

> Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action. As Professors Wright, Miller and Kane have discussed, in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated.' 7B Wright et al., §1778, at 59; see e.g., *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ('Class actions...may permit the plaintiff to pool claims which would be uneconomical to litigate individually.') The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.

*Lake v. First Nationwide Bank*, 156 F.R.D. 615 at 628, 629 (E.D.Pa 1994).

## CONCLUSION

50.     The Court should certify this action as a class action.

                              Respectfully submitted,


                              */s/ Daniel A. Edelman*
                              Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Carly M. Roman
**EDELMAN, COMBS, LATTURNER
       & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:
courtecl@edcombs.com
Atty. No. 41106 (Cook)

## **CERTIFICATE OF SERVICE**

      I, Daniel A. Edelman, certify that I had a copy of this document placed for service with the complaint.

                                              */s/Daniel A. Edelman*
                                              Daniel A. Edelman